**UNION SIMPLEX TRAIN CONTROL CO., Inc., v. GENERAL RY. SIGNAL CO. et al.**

**No. 459.**

Circuit Court of Appeals, Second Circuit.

Aug. 16, 1937.

Norton & Simmons and M. Theodore Simmons, all of New York City, for appellant.

Clifton V. Edwards, of New York City, Neil D. Preston, of Rochester, N. Y., and Frank A. Bower, of New York City, for appellees.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by complainant Union Simplex Train Control Company, Inc., from a decree of the District Court for the Western District of New York dismissing the bill of complaint charging patent infringement by defendants General Railway Signal Company and New York Central Railroad Company. The former defendant is sued as a manufacturer and the latter as a user. In our opinion the decree should be affirmed.

The patents involved are Ruthven No. 1,374,954, issued April 19, 1921, on an application filed October 8, 1918, and Ruthven No. 1,470,107, issued October 9, 1923, on an application filed June 15, 1917. Claim 4 of the former patent and claim 11 of the latter patent are relied on. The ground of dismissal in respect to each patent was noninfringment.

The patents relate to certain mechanisms used in a system of automatic train control. Both complainant's and defendants' systems operate in conjunction with the usual automatic block signal system

along a railway right of way wherein the track is divided into operating blocks of varying lengths, and wayside signals are automatically displayed in accordance with the traffic in the blocks. Both systems respond to the "danger" signal condition caused by the presence of a train in a block ahead and set up on an approaching locomotive a chain of operations which will bring about the braking or stopping of the train before the occupied block is reached, in much the same manner as an engineer would do if normally alert and controlling his train according to the wayside signal indications. Both automatic systems are arranged to transmit an effect between a trackway device located adjacent the wayside signal and simultaneously controlled by traffic conditions and an electromagnetic device on the locomotive to initiate a chain of operations including moving an actuator to operate the engineer's brake valve to stop the train. Patent No. 1,374,954 is termed the Armature patent and patent No. 1,470,107 the Actuator patent. Neither patent has ever gone into commercial use.

The Armature Patent No. 1,374,954.

■ Claim 4 of this patent, which is the only claim in issue, reads as follows:

"4. Vehicle controlling apparatus embodying a track armature arranged for the passage of a responsive vehicle device, and laminated longitudinally of the track in planes in which said device moves."

The specification sets forth objects of the invention as follows:

"It is the object of the invention to provide novel and improved means of cooperation between the vehicle and track equipments for controlling the movement of the vehicle under the various traffic conditions, such means eliminating the use of electrical, mechanical or other contact or similar devices between the vehicle and track, thereby removing a serious objection to train controlling apparatus embodying such contact devices. Another object is the provision of such means between the vehicle and track or road bed utilizing magnetic force in a novel manner as the medium of control, to dispense with contact and like devices and their objectionable characteristics.

"A further object is to provide novel magnetic means on the track for influencing the vehicle equipment, having improved features to enhance its utility."

Judge Knight in the court below correctly described the general working of the Ruthven device. Fig. 1 of the patent shows three magnets 46, 47 and 48 carried in a box under the engine. Under normal conditions they are all energized by direct current provided on the vehicle. The track device shows three armatures 40, 40 and 39 supported on rocker arms and enclosed in a metallic casing 41. When the track is clear of any train in the next block a solenoid 44 is energized to raise the armature 39 to its upper position and hold the armatures 40 by means of the rocker arms in the lower position. There is no change in the vehicle circuit. When the solenoid is de-energized, through the influence of the track signal system because there is a train ahead, the armature 39 drops, the armatures 40 rise, magnet 48 is pulled down by magnetic attraction, and magnets 46 and 47, being de-energized, are raised by a spring, and thereby through certain electric connections cause the actuator on the engineer's brake valve automatically to apply the brakes and stop the train.

We think that Judge Knight was entirely correct in saying, as he did in his opinion, that the words "Vehicle controlling apparatus embodying" found in claim 4 related to Ruthven's system as a whole and must in view of the prior art be regarded as limiting the scope of the particular part of the system referred to in the claim.

The particular features of the Ruthven device for automatic train control which are comprised in claim 4 are the track armature: (1) arranged for the passage of a responsive vehicle device; (2) laminated longitudinally of the track in planes in which the device moves. It is manifest that the armatures and magnets rising and falling, and thereby through various connections applying the air brakes to stop the train automatically, make an exceedingly complicated structure—also that the box containing these armatures, lying as it does between the tracks in the roadbed, runs some risk of encountering obstacles and having a clearance insufficient for safety. But if it be assumed to be safe and practicable, yet feature (1), namely, a track armature arranged for the passage of a responsive vehicle device, was old, as appears from United States patent No. 1,116,320 to Oler granted November 3, 1914, a closely pertinent reference, except for the absence of laminations in the track

armatures. A similar mechanism is found in United States patent No. 951,546 granted March 8, 1910, to Patterson where laminations are shown. The only remaining feature of claim 4 is that the armature shall be "laminated longitudinally of the track." Now it is impossible for the complainant to have a monopoly of all laminated track armatures arranged for the passage of responsive vehicle devices or even of those in which the laminations are longitudinal. The United States patent No. 559,872 to Stern granted May 12, 1896, shows laminæ lying in vertical planes "longitudinally of the track." Sylvanus P. Thompson in his treatise on Dynamo-Electric Machinery (5th Ed.) 1896, says that whenever iron is employed in armatures it must be laminated to prevent the generation of parasitic eddy currents; i. e., divided in planes insulated from one another parallel to the direction of magnetic flux. Otherwise such eddy currents will produce detrimental heat and absorb energy. The laminations in United States patent No. 951,546 to Patterson while crosswise instead of longitudinal of the track are so because the laminations of the car carried element are also crosswise, so that the laminations of the track inductor are in the planes of the lines of the course of magnetism created by the primary coils, thus following the teachings of Thompson. The French patents No. 434,903, to Hostache published February 18, 1912, and No. 465,615 to du Chambon published April 21, 1914, show laminations in the track armatures and the engine carried magnets. In spite of the dispute between the complainant's and the defendants' experts, we think the laminations shown by these French patents are longitudinal of the track. This is not only apparent from the drawings but from the teachings of Thompson, which require for efficient operation that laminations be crosswise of the course of the eddy currents. But, aside from the drawings which we believe show laminations longitudinal of the track, the patent to du Chambon states that the device operates when "one makes one of the stacks of sheet iron move rapidly opposite to the other in the direction of the plane." Even if we should assume that the laminations are crosswise of the track as in Patterson, they would still be parallel to the laminations of the engine magnets and at right angles to the lines of eddy currents in order to serve their proper function. In view of the prior art and the teachings of Thompson, it seems clear that

Ruthven can have no general monopoly in the use of laminations, whether longitudinal to the track or otherwise, but can only claim their use as an element in combination with a "responsive vehicle device" of the sort disclosed in his specification. The chief reason why the track laminations in the Ruthven device are longitudinal is that the armatures must have relatively great length in order to pull down the stopping magnet 48 when the train is running at high speed.

■ The final question is whether defendants' apparatus infringes claim 4 as above construed. Judge Knight described its operation as follows:

"The system shows a track device or 'U' shaped core, with a choke coil on one leg, a vehicle carried core of corresponding 'U' shape, with primary and secondary coils opposite to each other, stationed to pass directly over the track core; a system of electric circuits arranged to cause air to be retained in and forced within a so-called actuator; thereby applying or withholding application of the brakes. The track core is termed an 'inductor', the vehicle core, the 'receiver'. The system is supplied with a battery on the vehicle. There is produced by electro-magnetic induction from the 'inductor', as the coils pass each other, under danger conditions, an increased voltage in the receiver, and this de-energizes a relay on the vehicle which controls the brake application mechanism. The so designated primary coil is energized from a battery and produces a magnetic flux through the laminated core of the receiver and the secondary coil thereon. When the locomotive is travelling under clear conditions, * * * some of the magnetic flux passes between the pole pieces and through the secondary coil of the receiver. No voltage is then being induced in the secondary coil, and the relay RI is kept energized by current from the battery. When the 'receiver' passes over the track 'inductor' under stopping conditions, the choke coil on the 'inductor' is in open circuit, and the magnetism passing through the secondary coil is greatly increased, and there is an induced voltage in the secondary coil. This opposes the battery voltage, and a relay is thereby caused to become de-energized, and the connected relay circuits are also opened. Breaking these circuits causes an electro pneumatic valve to open and permits compressed air to be admitted and applied to the actuator on the engineer's brake

valve. It will be observed that the action on the 'receiver', when it passes over the 'inductor', is dependent upon whether the choke coil is in open circuit or otherwise.

"A distinguishing feature in the two devices in question is that defendant's vehicle cores are stationary; plaintiff's are movable. In the former physical motion is not relied upon; in the latter it is; in the former the 'inductor' is the inducing element of the current which causes the opening of a relay; in the latter physical motion resulting from magnetism is required before a similar current results."

The defendants' expert Burke testified as to the Ruthven apparatus that in "the utilizing of the electro-magnetic attraction to operate a switch, there is a certain amount of time necessary for the movement of the magnet to take place, and so the armature 40, instead of being as in the well-known electro-magnet, has to be prolonged something comparable with a trolley line to carry that magnetism along so that the magnetism pull can continue while the train moves along."

In the defendants' system, on the other hand, the operation depends on the rate of change of the magnetic flux and on the fact that the more rapid the change the higher the induced voltage. Thus the more rapid the movement of the train the more efficient is the apparatus. It resembles in operation the Kingdon current generator described in Thompson's book on Dynamo-Electric Machinery (5th Ed.) 1896, rather than the Ruthven device. Therefore, while the laminations used by defendants are both longitudinal of the track and vertical, the operation of their device is entirely different from that of Ruthven. Their armature is only about 18 inches in length, and the direction in which the laminations run is only a matter of convenience, provided those in the engine carried magnet and those in the armature are in the same plane so as to be crosswise of any eddy currents. But, to avoid trackage obstacles, the defendants have placed their laminated armature outside the rails. In an armature thus placed the laminated plates would necessarily be longitudinal of the track in order that the receiver on the train as well as the armature itself should not extend far out into the right of way. In other words, where an armature is placed outside of the track, the laminations would have to be longitudinal to be effective and to follow the teachings of Thompson.

In view of the limitations of the prior art, we hold that the defendants have not infringed claim 4.

### The Actuator Patent No. 1,470,107.

Claim 11 of this patent which is alone in issue reads as follows:

"11. A vehicle controlling apparatus embodying the combination with an air brake equipment including a brake valve having an oscillatory stem, of means for automatically operating the brake valve including a casing assembled with the brake valve and through which the stem extends, an oscillatory member within the casing having limited movement relative to the stem, and means for oscillating said member in opposite directions, said member when in normal position permitting the stem to be oscillated for operating the valve."

Judge Knight held that this claim was not infringed by the defendants' device. In Ruthven's construction a casing is mounted on top of the engineer's brake valve. The oscillatory member in the casing is loosely fitted on the valve stem and carries a key which moves in a groove cut in the stem. The member is adapted to move in the casing about 90 degrees. Under danger conditions compressed air is released through a pipe into chamber 111' and against the face of the oscillatory member or piston, thereby causing it to rotate and move the brake valve stem with it to the braking position. In such a position the engineer may move the valve stem an additional distance by the operation of his handle. When the oscillatory member is to be returned to its first position, air is admitted through a second pipe into chamber 112' to act on the other face of the piston.

The defendants' device also makes an application of the air brakes through the admission and release of air pressure to two chambers. The piston, however, is not oscillatory but reciprocatory. United States patent No. 1,113,027 to Mastrangelo, issued October 6, 1914, shows a reciprocating piston which is moved by air pressure to apply the brakes but returned to its normal position by a spring rather than by air pressure. United States patent No. 752,101 to Powers, issued February 16, 1904, also shows a reciprocating piston op-

954

erated by air pressure to apply the brakes and likewise returned to its first position by a spring. The pressure operates upon the brake valve handle and not upon the stem of the valve. United States patent No. 923,297 to Price, issued June 1, 1909, operates in much the same way. See, also, United States patent No. 1,265,943 to Murray issued May 14, 1918. In view of the foregoing patents, we think that the Ruthven patent discloses only a new assemblage of familiar mechanisms which, though combined and doubtless useful, fail to show inventive genius.

When once air pressure has been used to move a piston in order to open a valve and apply air brakes, the use of it instead of a spring to return the piston to its original position is an obvious, simple thing, requiring no inventive thought. Similarly, when a piston had long been used to actuate the engineer's handle, it could not be regarded as inventive genius to use it to actuate the stem directly. This is particularly true since claim 11, if read broadly, would include a spring as a "means for oscillating said member in opposite directions." But, even if the claim were valid, in view of the prior art, it would have to be limited to the structure disclosed in the patent, which is an oscillating piston and, therefore, would not be infringed. We, however, hold claim 11 invalid because of such prior art.

The decree is affirmed as to the claims of both patents in suit, and claim 11 of the second or actuator patent is held void for lack of invention.